# Illinois Official Reports

## Appellate Court

---

## *Chung v. Pham*, 2020 IL App (3d) 190218

---

| | |
|---|---|
| Appellate Court Caption | DAWN CHUNG, Plaintiff-Appellee, v. SONNY PHAM, Defendant-Appellant (Hoa Tuyet Pham, Intervenor-Appellant).–HOA TUYET PHAM, Plaintiff-Appellant, v. SONNY PHAM and DAWN CHUNG, Defendants-Appellees. |
| District & No. | Third District<br>Nos. 3-19-0218, 3-19-0536 cons. |
| Filed | March 20, 2020 |
| Decision Under Review | Appeal from the Circuit Court of Peoria County, Nos. 15-CH-89, 18-CH-24; the Hon. Katherine S. Gorman Hubler and the Hon. Mark E. Gilles, Judges, presiding. |
| Judgment | Affirmed in part and reversed in part.<br>Cause remanded with directions. |
| Counsel on Appeal | Rhonda Heinz, of Westervelt, Johnson, Nicoll & Keller, LLC, of Peoria, for appellant Sonny Pham.<br><br>Jeffrey Alan Ryva, of Quinn, Johnston, Henderson, Pretorius & Cerulo, of Peoria, for other appellant.<br><br>Joseph B. VanFleet and Graciela Mata Gomez, of Howard & Howard Attorneys PLLC, of Peoria, for appellee. |

JUSTICE WRIGHT delivered the judgment of the court, with opinion. Presiding Justice Lytton and Justice Carter concurred in the judgment and opinion.

## OPINION

¶ 1     This appeal involves separate proceedings from the circuit court of Peoria County. Peoria County case No. 15-CH-89 was brought by plaintiff-appellee, Dawn Chung, against defendant-appellant, Sonny Pham, for the specific performance of a commercial real estate purchase agreement (purchase agreement). The circuit court granted, and our court affirmed, partial summary judgment and specific performance in favor of Dawn. While Sonny's appeal of these grants in Peoria County case No. 15-CH-89 were pending, the circuit court allowed plaintiff-appellant, Hoa Tuyet Pham, a/k/a Cindy, to file an intervention complaint in Peoria County case No. 15-CH-89. Cindy also brought a foreclosure lawsuit, Peoria County case No. 18-CH-24, against Dawn and Sonny with respect to the commercial real estate subject to the purchase agreement. The circuit court involuntarily dismissed Cindy's complaints in Peoria County case Nos. 15-CH-89 and 18-CH-24. The circuit court then awarded Dawn attorney fees, property taxes, and rent under the purchase agreement in Peoria County case No. 15-CH-89. Cindy, joined by Sonny, appeals in case No. 3-19-0218.

¶ 2     While Cindy and Sonny's appeal was pending, Dawn filed a motion to compel Sonny to transfer the commercial real estate in accordance with the purchase agreement and prior court orders. The circuit court held a hearing, during which it oversaw the transfer of the deed to and monies for the commercial real estate. Cindy appeals in case No. 3-19-0536.

¶ 3     On our court's own motion, Peoria County case Nos. 15-CH-89 and 18-CH-24 were consolidated for purposes of appeal. In addition, on our court's own motion, appeal No. 3-19-0536 was consolidated with appeal No. 3-19-0218.

¶ 4                                    I. BACKGROUND

¶ 5     On December 3, 2014, Dawn and Sonny executed a purchase agreement for commercial real estate, located at 7814 N. Sommer Street in Peoria. The purchase price of the commercial real estate was $202,000, which, under the purchase agreement, was to be "adjusted by prorations and credits allowed the parties." Sonny represented, warranted, and covenanted that, as of the date of the purchase agreement's execution and as of the closing date, he was "the sole owner of and ha[d] good and merchantable fee simple title to the Real Property." Likewise, Sonny represented, warranted, and covenanted that, as of the date of the purchase agreement's execution and as of the closing date, "[t]here [we]re no leases (oral or written), options, purchase contracts, or other agreements of any kind or nature, written or oral, whereunder or whereby any party could claim or assert any right, title, or interest in the Real Property that have not been disclosed." Initially, the closing date was scheduled for January 14, 2015. However, Dawn and Sonny subsequently agreed to delay the closing until February 14, 2015.

¶ 6     Sonny refused to close on the commercial real estate. At the time of the scheduled closing, the commercial real estate was subject to a mortgage held by Morton Community Bank but had no other encumbrances. Following Sonny's refusal to close, Dawn, on March 5, 2015, filed a 12-count verified complaint in Peoria County case No. 15-CH-89 (underlying lawsuit)

seeking, among other things, the specific performance of the purchase agreement. Dawn made at least 14 unsuccessful attempts to serve Sonny in the underlying lawsuit. Before Dawn could effectuate service, Sonny, on April 8, 2015, borrowed $201,043.89 from his sister, Cindy, to pay off the mortgage held by Morton Community Bank.[1] Sonny's loan from Cindy was secured by a mortgage on the same commercial real estate subject to Dawn and Sonny's purchase agreement. On the same day the mortgage was delivered by Sonny, April 8, 2015, Cindy recorded the mortgage in Peoria County. Thereafter, Morton Community Bank released its mortgage.

¶ 7        On April 14, 2015, Dawn filed a motion requesting a special order allowing service of process on Sonny's attorney. The circuit court granted Dawn's motion under section 2-203.1 of the Code of Civil Procedure (Code). 735 ILCS 5/2-203.1 (West 2014). Sonny's attorney of record was served with a copy of the verified complaint filed in the underlying lawsuit on April 21, 2015. Thereafter, on April 23, 2015, Dawn recorded a *lis pendens* notice in Peoria County, as required by section 2-1901 of the Code. *Id.* § 2-1901.

¶ 8                    A. Events Related to the First Appeal—Case No. 3-17-0487

¶ 9        Eventually, on June 26, 2017, the circuit court granted partial summary judgment in favor of Dawn in the underlying lawsuit.[2] The circuit court found that a valid and enforceable purchase agreement existed between Dawn and Sonny, Sonny breached the purchase agreement, and Dawn proved the elements necessary for an order requiring the specific performance of the purchase agreement. The circuit court enjoined Sonny from transferring the commercial real estate to anyone other than Dawn and ordered that the terms of the purchase agreement be performed within 60 days. The circuit court retained jurisdiction to hold any hearings necessary for the enforcement of the order or a determination of attorney fees or damages. Sonny timely filed a notice of appeal on July 25, 2017. Our court affirmed the circuit court's grant of partial summary judgment and order of specific performance. See *Chung v. Pham*, 2018 IL App (3d) 170487-U. The mandate issued on January 8, 2019.

¶ 10       On August 18, 2017, the circuit court stayed the proceedings pending Sonny's appeal. However, the stay was contingent upon Sonny filing "[b]ond *** in the amount of $202,000.00" within 30 days. See Ill. S. Ct. R. 305(b) (eff. July 1, 2017) ("A bond or other form of security may be required in any case, and shall be required to protect an appellee's interest in property."). Sonny did not file the bond, so the stay was lifted after 30 days.

¶ 11       As a result, on September 20, 2017, Dawn filed a petition for attorney fees and rule to show cause as to why Sonny had not closed on the commercial real estate, as required by the circuit court's June 26, 2017, order. According to Dawn, no response was received from Sonny when she attempted to schedule a closing. On October 20, 2017, Sonny filed an objection to Dawn's

---

[1]Cindy was not a party to Dawn and Sonny's purchase agreement.

[2]Partial summary judgment was granted in favor of Dawn for her counts of breach of the purchase agreement and breach of her and Sonny's lease agreement. With respect to the count for breach of the purchase agreement, Dawn sought both specific performance and "reasonable attorney's fees and costs of this suit." Dawn also alleged counts of breach of implied covenant of quiet enjoyment, breach of implied warranty of merchantability, breach of implied warranty of fitness for a particular purpose, unjust enrichment, fraud and inducement, conversion, fraud, tortious interference with contracts, tortious interference with prospective economic advantage, and defamation.

petition for attorney fees, arguing the purchase agreement does not provide attorney fees to Dawn and, in the alternative, that Dawn's request was unreasonable. On this same day, the circuit court entered an order for rule to show cause against Sonny, stating "it appear[s] that [Sonny] has willfully refused to perform under a Real Estate Sales Contract and transfer the real property and improvements to [Dawn] pursuant to Orders of this Court." Sonny was commanded to appear at a hearing on Dawn's petition for rule to show cause.[3]

¶ 12                    B. Events Related to the Second Appeal—Case No. 3-19-0218

¶ 13        On December 5, 2017, while Sonny's appeal was pending and on the same day he was scheduled to appear for Dawn's petition for rule to show cause, Cindy filed a petition to intervene in the underlying lawsuit. Cindy requested "the Court allow her to intervene in this action and allow her 45 days to file any necessary pleadings." This same day, the circuit court, by agreement of the parties, granted the petition to intervene and provided Cindy with "45 days to file any Pleadings."

¶ 14        Cindy filed an intervention complaint on January 18, 2018. Cindy's intervention complaint alleged that she had a mortgage on the commercial real estate subject to Dawn and Sonny's purchase agreement. Thus, intervention was appropriate to protect her position as a mortgagee. Cindy sought a court order requiring the payment of her mortgage as part of any transfer of the commercial real estate. Further, the prayer for relief contained in the intervention complaint requested "the court to allow [Cindy] to participate in the case." The mortgage executed by Sonny and Cindy was attached to Cindy's intervention complaint.

¶ 15        Also on January 18, 2018, while Sonny's appeal from the underlying lawsuit was pending, Cindy filed a foreclosure complaint in Peoria County case No. 18-CH-24 (foreclosure lawsuit). In this foreclosure lawsuit, Cindy alleged that she held a recorded mortgage on the commercial real estate subject to Dawn and Sonny's purchase agreement. The mortgage executed by Sonny and Cindy was attached to Cindy's complaint. According to the foreclosure complaint, the initial $201,043.89 mortgage delivered by Sonny was now in default and totaling $229,393.47.

¶ 16        On March 15, 2018, Dawn filed separate section 2-619(a)(9) motions to dismiss Cindy's intervention and foreclosure complaints in the underlying and foreclosure lawsuits. See 735 ILCS 5/2-619(a)(9) (West 2016). In her motions to dismiss, Dawn argued Cindy had actual notice of Dawn's underlying lawsuit before recording her mortgage on April 8, 2015. In response to Dawn's requests for admissions of facts in the underling lawsuit, Cindy admitted she was "aware of [that] lawsuit when [she] had the Mortgage recorded." Further, Cindy admitted she "discussed [that] lawsuit with [Sonny] prior to recording the Mortgage."

¶ 17        On June 8, 2018, the circuit court entered a single order resolving Dawn's separately filed motions to dismiss in the underlying and foreclosure lawsuits. The circuit court's order stated: "[t]he Court finds as a matter of law when applying the legal doctrines of *lis pendens* and *pendate* [*sic*] *lite* that [Cindy]'s interest *** in real estate is junior to the interest created by [Dawn]'s summary judgment in [the underlying lawsuit]." Cindy filed separate motions to reconsider, amend, and for a stay in the underlying and foreclosure lawsuits on July 9, 2018.

_____

[3]This hearing was finally held on January 11, 2019, after multiple continuances and a stay of the circuit court proceedings, entered on August 30, 2018, pending our court's resolution of the first appeal, case No. 3-17-0487.

- 4 -

¶ 18       In the meantime, on August 16, 2018, Dawn filed a supplemental memorandum in support of her original petition for attorney fees and rule to show cause, filed on September 20, 2017. In addition to attorney fees, Dawn requested property taxes and rent under the purchase agreement in the underlying lawsuit.[4] Regarding rent, section 3(K)(ii) of article II of Dawn and Sonny's purchase agreement states:

> "Rents under all leases of the Real Property (exclusive of delinquent rents, but including prepaid rents); security deposits; common area maintenance and other payments payable by tenants, for or in connection with such use of occupancy thereof; operating expenses; personal property taxes, if any; and all other items customarily prorated or adjusted on the conveyance of similar properties shall be prorated as of the Closing Date (on a *per diem* basis, except to the extent that such above mentioned items are paid by tenants or addressed in § 3(c)(iii) herein)."

¶ 19       With respect to attorney fees, several sections of article II of Dawn and Sonny's purchase agreement reference monetary obligations. Section 4(B)(i) and (ii) provide:

> "(i) Except for matters which can be removed by the payment of money, which Seller agrees to remove at or before Closing, the Real Property is not subject to any liens, security interests, liabilities or judgments of any kind whatsoever.
>
> (ii) Seller shall be responsible for all debts, claims, contracts, and liabilities in any way connected with the conduct of its operations on the Real Property, and Purchaser shall have no liability for Seller's operations conducted on the Real Property or otherwise or for any liabilities, known, unknown, contingent or otherwise, of Seller."

Section 5 of article II, pertaining to a default by the parties, provides:

> "If Purchaser wrongfully refuses to close the sale of the Real Property or is unable to close the sale of the Real Property under the terms of this Agreement, the same shall constitute a breach of this Agreement and Seller shall be entitled to all remedies under Illinois law at the time of the breach, including, without limitation, *** the right to recover as an element of its damages, reasonable attorney's fees and court costs and all other damages that Purchaser will suffer as a result of Purchaser's breach or default hereunder. If Seller wrongfully refuses to close the purchase of the Real Property, the same shall constitute a breach of this Agreement and Purchaser shall be entitled to all remedies under Illinois law at the time of breach."

¶ 20       On August 30, 2018, following a hearing, the circuit court denied reconsideration of the dismissals of Cindy's complaints in the underlying and foreclosure lawsuits. However, the circuit court granted Cindy leave to amend her complaints. The circuit court also, on Cindy's request and over Dawn's objection, entered a stay of the proceedings pending our court's resolution of the first appeal, case No. 3-17-0487. This time, the stay was not contingent upon the filing of bond, as required by Rule 305(b).

¶ 21       On September 21, 2018, Cindy filed her amended complaints in the underlying and foreclosure lawsuits. Cindy alleged in her amended complaints that Sonny used the funds he

---

[4]Regarding property taxes, the circuit court subsequently cited to section 3(F)(i) and (ii) of article II of the purchase agreement and found Dawn should receive a credit against the $202,000 purchase price in the amount of $17,964.79 for 2016 and 2017, $7823.78 for 2018, and $21.44 per day through the closing for 2019. On appeal, Cindy and Sonny focus their arguments on rent and attorney fees rather than on property taxes.

received from Cindy to pay off and replace the mortgage held by Morton Community Bank. Cindy also alleged her mortgage was recorded on April 8, 2015, before Dawn served Sonny in the underlying lawsuit on April 21, 2015, or recorded a *lis pendens* notice on April 23, 2015. The prayer for relief in the amended intervention complaint again requested "the court to allow [Cindy] to participate in the case." After Cindy's amendments, Dawn again filed separate section 2-619(a)(9) motions to dismiss in the underlying and foreclosure lawsuits.

¶ 22    On January 11, 2019, the circuit court held a combined hearing and took all pending matters in the underlying and foreclosure lawsuits under advisement, including Dawn's motions to dismiss, petition for rule to show cause, and requests for attorney fees and rent. On January 30, 2019, the circuit court issued a single written order resolving these issues. The parties do not dispute that the circuit court granted Dawn's section 2-619(a)(9) motions to dismiss Cindy's amended intervention and foreclosure complaints in the underlying and foreclosure lawsuits.

¶ 23    Further, with respect to the foreclosure lawsuit, the circuit court relied upon and recited its prior findings from June 8, 2018, concerning the doctrine of *lis pendens*. The circuit court found that, as a matter of law, Cindy's interest in the commercial real estate was junior to Dawn's interest arising from the order granting partial summary judgment in the underlying lawsuit. The circuit court then found:

> "[Cindy's] actual knowledge of the underlying lawsuit bars any attempt that she may take to assert lien priority to the Premises over [the] interest obtained by [Dawn] by virtue of her summary judgment in [the underlying lawsuit]. Accordingly, the doctrines of *lis pendens* and *pendite lite* [*sic*]bar any relief sought by [Cindy] against Dawn *** in this [foreclosure] action and she has superior rights to the Premises over [Cindy]."

¶ 24    With respect to the underlying lawsuit against Sonny, the circuit court found: "the Appellate Court affirmed [Dawn]'s Motion for Partial Summary Judgment on the issue of her breach of contract claim and found she is entitled to specific performance [of the purchase agreement]." After this finding, the circuit court moved on to resolve Dawn's requests for the payment of rent and attorney fees under the purchase agreement.

¶ 25    Regarding rent, the circuit court cited section 3(K)(ii) of article II of the purchase agreement and found "[t]here is no dispute [Dawn] paid [Sonny] monthly rent of $1936.00. From 2/14/15 *** through the date of closing shall be prorated and credited to [Dawn]."[5] Further, the circuit court, while citing language from Dawn's petition that was not contained in the purchase agreement, awarded $50,000 in attorney fees, which were to be paid by Sonny at closing. The closing was ordered to take place within 28 days.

¶ 26    Cindy and Sonny filed separate motions to reconsider in the underlying and foreclosure lawsuits. The circuit court denied these motions to reconsider on March 25, 2019, and again ordered the parties to close on the commercial real estate within 31 days. Three days earlier, the circuit court entered a default judgment against Sonny and in favor of Cindy in the amount of $229,393.47, plus costs and *per diem* interest of $27.54, in the foreclosure lawsuit.

¶ 27    On April 22, 2019, Cindy filed separate amended notices of appeal in the underlying and foreclosure lawsuits, challenging the circuit court's June 8 and August 30, 2018, and

---

[5]On September 8, 2015, Sonny filed a counterclaim against Dawn in the underlying lawsuit, stating Dawn "is indebted *** for rent *** at the rate $1,935.66 per month." Dawn argued this was a judicial admission justifying her receipt of $1936 in rent.

January 30 and March 25, 2019, orders. On April 23, 2019, Sonny filed a notice purportedly "joining [the] appeal of *** [Cindy]," wherein he listed both case Nos. 15-CH-89 and 18-CH-24 and challenged the circuit court's January 30 and March 25, 2019, orders.[6]

¶ 28                    C. Events Related to the Third Appeal—Case No. 3-19-0536

¶ 29        On June 14, 2019, while Cindy and Sonny's appeal was pending, Dawn filed a motion to compel the transfer of the commercial real estate and for a rule to show cause as to why Sonny had not previously done so. Dawn filed a verified supplement to her motion on July 15, 2019. The circuit court entered an order for rule to show cause on July 16, 2019, commanding Sonny to appear on July 24, 2019.[7] The circuit court stated it appeared Sonny "willfully refused to perform under a Real Estate Sales Contract and transfer the real property and improvements to [Dawn] pursuant to Orders of this Court."

¶ 30        The July 24, 2019, hearing was held as scheduled with Sonny present in court. On this date, the circuit court entered an order in the underlying and foreclosure lawsuits granting in part and denying in part Cindy and Sonny's objection to the attorney fees setoff to the purchase price of the commercial real estate. The circuit court ordered that, in the closing statement, Dawn's $50,000 attorney fees award should be removed from the same category as the offsets for property taxes and rent under the purchase agreement. The $50,000 attorney fees award was to be listed as a separate category entitled "Less Amounts for Attorney's Fees Called for in Court Order." Judge Gilles stated "[t]hat's the way I interpret Judge Gorman's order."

¶ 31        The circuit court also overruled Cindy and Sonny's objection to the language of the deed for the commercial real estate. In particular, the circuit court allowed the statement "[t]he premises are specifically *not* conveyed subject to the Mortgage recorded on April 8, 2015 by [Cindy]." Finally, the circuit court stated that the order to show cause would be discharged upon Sonny's transfer of the deed to Dawn and the exchange of a cashier's check for the balance shown on the closing statement. Sonny conveyed the deed for the commercial real estate to Dawn on July 24, 2019. According to the closing statement, Dawn owed Sonny $19,229.67 of the $202,000 purchase price. The $202,000 purchase price was offset by property taxes from 2016-2019 ($30,162.33), 53 months of rent ($102,608), and attorney fees ($50,000). The amount of $19,229.67 was paid by Dawn to Sonny on July 24, 2019.

¶ 32        Cindy filed a motion to reconsider or for partial stay in the underlying and foreclosure lawsuits on July 26, 2019, which was denied by the circuit court in identical orders filed on August 15 and 16, 2019. Cindy filed a timely notice of appeal on September 9, 2019.

----

[6]Notably, Sonny uses his appellate brief to merely adopt the facts and arguments presented by Cindy. Sonny does not appeal the dismissal of Cindy's complaints in the underlying and foreclosure lawsuits but adopts Cindy's arguments with respect to Dawn's awards of attorney fees and rent under the purchase agreement. Sonny did, however, file a substantive reply brief.

[7]Prior to this point, Judges James A. Mack and Katherine S. Gorman Hubler presided over the proceedings in the underlying and foreclosure lawsuits. After Cindy and Sonny appealed Judge Gorman Hubler's rulings on April 22 and 23, 2019, respectively, Judge Mark E. Gilles became the presiding judge.

¶ 33                              D. Consolidation of Circuit Court Cases and Appeals

¶ 34        It is not clear from the record whether the underlying and foreclosure lawsuits were formally consolidated by the circuit court. Therefore, on January 13, 2020, on our court's own motion, those cases were consolidated for purposes of appeal. In addition, appeal No. 3-19-0536 was consolidated with appeal No. 3-19-0218.

¶ 35                                              II. ANALYSIS

¶ 36                                           A. Appeal No. 3-19-0218

¶ 37        The issues in appeal No. 3-19-0218 can be summarized as whether the circuit court erred by (1) dismissing Cindy's complaints in the underlying and foreclosure lawsuits or (2) awarding Dawn attorney fees and rent under the purchase agreement. Each issue is addressed below.

¶ 38                              1. Dismissals of Cindy's Complaints in the
                                     Underlying and Foreclosure Lawsuits

¶ 39        The circuit court twice granted Dawn's separate section 2-619(a)(9) motions to dismiss Cindy's intervention and foreclosure complaints in the underlying and foreclosure lawsuits. Section 2-619(a)(9) permits involuntary dismissals where "the claim asserted *** is barred by other affirmative matter avoiding the legal effect of or defeating the claim." 735 ILCS 5/2-619(a)(9) (West 2016). An "affirmative matter" means "something in the nature of a defense which negates the cause of action completely." (Internal quotation marks omitted.) *Donelson v. Hinton*, 2018 IL App (3d) 170426, ¶ 9. When the circuit court decides a section 2-619(a)(9) motion to dismiss, all pleadings and supporting documents are construed in the light most favorable to the nonmoving party. *Dawson v. City of Geneseo*, 2018 IL App (3d) 170625, ¶ 17. We conduct a *de novo* review. *Id.*

¶ 40                                            a. *Lis Pendens*

¶ 41        The circuit court's section 2-619(a)(9) dismissals of Cindy's intervention and foreclosure complaints were based upon an application of *lis pendens*. Thus, a brief review of the long-existing common law doctrine of *lis pendens* and the more recent statutory provisions related to that doctrine is in order.

¶ 42        Historically, the doctrine of *lis pendens* was developed at common law to avoid the "endless litigation of property rights precipitated by transfers of interest" in the property after litigation has begun. *First Midwest v. Pogge*, 293 Ill. App. 3d 359, 363 (1997); *Lake County Grading Co. v. Forever Construction, Inc.*, 2017 IL App (2d) 160359, ¶ 53. The doctrine of *lis pendens* began as an equitable remedy that bound all subsequent purchasers or encumbrancers of property to the outcome of a pending lawsuit affecting the title to or lien on that property. *Pogge*, 293 Ill. App. 3d at 363; *Lake County Grading Co.*, 2017 IL App (2d) 160359, ¶ 54. In *Allen & Korkowski & Associates v. Pettit*, the Fourth District noted that the common law doctrine of *lis pendens* operates *in rem*, resulting in "persons not parties to the litigation and not even subject to the jurisdiction of the court in the case [being] bound." 108 Ill. App. 3d 384, 389 (1982). The inflexible doctrine was premised on the notion that the existence of a lawsuit triggers constructive " 'notice to the world.' " *Pogge*, 293 Ill. App. 3d at 363; *Lake County Grading Co.*, 2017 IL App (2d) 160359, ¶ 54.

¶ 43    On the one hand, constructive " 'notice to the world' " created a risk that subsequent third party purchasers or encumbrancers of property, lacking direct knowledge of a pending lawsuit, would be saddled with the outcome of that pending lawsuit. See *Pogge*, 293 Ill. App. 3d at 363; *Lake County Grading Co.*, 2017 IL App (2d) 160359, ¶ 54. On the other hand, subsequent third party purchasers or encumbrancers of property who had direct knowledge of a pending lawsuit, namely actual notice, would be bound, as always, to the outcome of that pending lawsuit. *Pogge*, 293 Ill. App. 3d at 363-64; *Lake County Grading Co.*, 2017 IL App (2d) 160359, ¶ 54.

¶ 44    It has been recognized that three requirements must be met for *lis pendens* to apply: (1) the property must be of a character as to be subject to the rule, (2) the circuit court must have jurisdiction over " 'the person and of the res,' " and (3) the property must be sufficiently described in the circuit court pleadings. *Norris v. Ile*, 152 Ill. 190, 202 (1894); accord *Pogge*, 293 Ill. App. 3d at 363 (citing 3 Richard A. Michael, Illinois Practice, Civil Procedure Before Trial § 21.1 (1989)). Related to the second requirement, " '[t]he *lis pendens* begins from the service of the summons or subpoena after the filing of the bill.' " *Allen*, 108 Ill. App. 3d at 389 (quoting *Norris*, 152 Ill. at 199); see also *Grant v. Bennett*, 96 Ill. 513, 521 (1880) ("The service of subpoena alone is not sufficient, but a bill must also be filed, and where a bill has been filed and a subpoena served, whether the bill was filed before or after service, *lis pendens* begins from the date of the service and not from the filing of the bill.").

¶ 45    When it originated, the common law doctrine of *lis pendens*, which viewed a pending lawsuit as constructive "notice to the world," was not unduly cumbersome because in "an earlier, simpler era, when the amount of litigation was not progressing exponentially, the rule was workable. Clerk's docket books were slim, and 'everybody knew' what was going on in court, especially in the smaller communities." *Allen*, 108 Ill. App. 3d at 391.

¶ 46                    i. Current Status of Constructive "Notice to the World"

¶ 47    However, as the courthouse docket books became voluminous, it was less and less likely that " 'everybody knew' " what legal disputes were brewing, even in the smaller communities. See *id.* Truthfully, as the court in *Allen* stated, "[t]oday it requires sophisticated electronic equipment for even a court itself to track the docket." *Id.* Based on these changes in our fast-paced society, our legislature developed a statutory solution to soften the harshness of the common law doctrine of *lis pendens* for a third party subsequent purchaser or encumbrancer of property who was in the dark about a pending lawsuit. See 735 ILCS 5/2-1901 (West 2014). The mere existence of a pending lawsuit is no longer treated as constructive notice for purposes of *lis pendens*.

¶ 48    Now, the provisions of section 2-1901 require a party to the lawsuit to affirmatively provide formal constructive "notice to the world" of their pending lawsuit. See *id.* "Before there may be 'constructive notice,' a *lis pendens* notice must be filed in the recorder's office" by a party to the lawsuit. *Pogge*, 293 Ill. App. 3d at 363; see also *Lake County Grading Co.*, 2017 IL App (2d) 160359, ¶ 55; 735 ILCS 5/2-1901 (West 2014). Simply stated, if a *lis pendens* notice is not filed in the recorder's office, as required by section 2-1901, then a subsequent third party purchaser or encumbrancer of property, which is the subject of a pending lawsuit, will not be bound by the outcome of that pending lawsuit. 735 ILCS 5/2-1901 (West 2014); *Pogge*, 293 Ill. App. 3d at 363; *Lake County Grading Co.*, 2017 IL App (2d) 160359, ¶ 55.

¶ 49                          ii. Current Status of Actual Notice

¶ 50        Significantly, section 2-1901 does not alter the harshness of the common law doctrine of *lis pendens* for third party subsequent purchasers or encumbrancers of property who have direct knowledge, *i.e.*, actual notice, of a pending lawsuit. *Pogge*, 293 Ill. App. 3d at 363-64; *Lake County Grading Co.*, 2017 IL App (2d) 160359, ¶ 56; accord *Voga v. Voga*, 376 Ill. App. 3d 1075, 1081 (2007). As at least two courts have succinctly stated, "[i]t would be inconsistent to bind those with constructive notice of the pending action [under section 2-1901] but not those with actual notice." *Pogge*, 293 Ill. App. 3d at 364; *Lake County Grading Co.*, 2017 IL App (2d) 160359, ¶ 56; see also *U.S. Bank National Ass'n v. Johnston*, 2016 IL App (2d) 150128, ¶ 45 ("Actual notice is knowledge that the purchaser had at the time of the conveyance."). For this reason, parties with actual notice of a pending lawsuit remain subject to the common law doctrine of *lis pendens*, even if there is noncompliance with section 2-1901. *Pogge*, 293 Ill. App. 3d at 363-64; *Lake County Grading Co.*, 2017 IL App (2d) 160359, ¶ 56; *Voga*, 376 Ill. App. 3d at 1081.

¶ 51            iii. Current Interface of Common Law and Statutory *Lis Pendens*

¶ 52        The effect of the coexistence of the common law doctrine of *lis pendens*, resulting from actual notice, and section 2-1901, governing constructive notice, is straightforward. At this time, subsequent third party purchasers or encumbrancers of property involved in a pending but unresolved lawsuit can be assigned to one of three categories: (1) those with actual notice who are and always have been subject to the common law doctrine of *lis pendens*; (2) those with constructive notice who, after the filing of a *lis pendens* notice, are subject to section 2-1901; or (3) those with neither actual nor constructive notice who are not subject to the common law doctrine of *lis pendens* or section 2-1901 and, thus, whose interests are superior to any interest resulting from the pending lawsuit. See *Pogge*, 293 Ill. App. 3d at 363-64; *Lake County Grading Co.*, 2017 IL App (2d) 160359, ¶¶ 54-56; 735 ILCS 5/2-1901 (West 2014).

¶ 53              iv. Application of *Lis Pendens* to the Present Appeal

¶ 54        Here, Cindy obtained and recorded her mortgage on April 8, 2015. It was not until 15 days later, on April 23, 2015, that Dawn filed a *lis pendens* notice in Peoria County. Thus, we may swiftly conclude, as Cindy argues for purposes of this appeal, that Cindy did not receive constructive notice under section 2-1901 and cannot be bound to the outcome of the underlying lawsuit on that basis. See 735 ILCS 5/2-1901 (West 2014). Consequently, Cindy does not fall under the second category of third party subsequent purchasers or encumbrancers of property.

¶ 55        Next, we must determine whether Cindy had actual notice of the underlying lawsuit. This determination will indicate whether Cindy falls within the first or the third category of third party subsequent purchasers or encumbrancers of property. The former category subjects Cindy to the common law doctrine of *lis pendens*, as Dawn argues, while the latter category protects Cindy from any application of *lis pendens*, as Cindy argues.

¶ 56        The determination and effect of Cindy's actual notice, or lack thereof, is dictated by the guidance set forth by our supreme court in *Grant*, which was one of the first cases in which our supreme court addressed the doctrine of *lis pendens*. See *Grant*, 96 Ill. at 521-25. The significance of *Grant*, which preceded our supreme court's opinion in *Norris*, cannot be overemphasized. See *Norris*, 152 Ill. at 199, 202. *Grant* became a cornerstone for the oft-cited principle that *lis pendens* "begins from the date of the service." *Grant*, 96 Ill. at 521.

¶ 57    As a cautionary introduction, the archaic language employed in *Grant* is difficult to digest with a mere cursory reading. Indeed, an incomplete reading of *Grant* produces inaccurate conclusions. However, an understanding of our supreme court's discussion in that case of both constructive and actual notice is vital to the outcome of the present appeal. Thus, we begin by reviewing the pertinent facts in *Grant*, the analysis developed by our supreme court with respect to *lis pendens*, and the facts contained in the record in the present appeal.

¶ 58    The facts in *Grant* reveal that a Mr. Rockafellow, the prior owner of the property at issue, was seeking a reconveyance of title and possession of the property from a Miss Newcomb. *Id.* at 520. Rockafellow filed his bill in the circuit court of Cook County against Newcomb about one hour before Newcomb conveyed the property to a third party, Mr. Grant. *Id.* Three days after Newcomb conveyed the property to Grant, Newcomb was personally served with the summons in Rockafellow's lawsuit. *Id.* at 531 (Dickey, C.J., dissenting). When before our supreme court, Grant argued that his status as an innocent third party purchaser made his interest in the property superior to that of Rockafellow, as determined by his lawsuit against Newcomb. *Id.* at 524-25 (majority opinion).

¶ 59    The timing of events in this appeal mirror the timing of events in *Grant*. As in *Grant*, Dawn filed a verified complaint in the circuit court to obtain title and possession of the commercial real estate from Sonny. See *id.* at 520. Likewise, after Dawn filed her complaint on March 5, 2015, but before Sonny's attorney finally accepted service of process on his behalf on April 21, 2015, Sonny conveyed a security interest on the commercial real estate to Cindy. See *id.* As in *Grant*, Cindy then asserted that her status as a third party subsequent encumbrancer made her interest in the commercial real estate superior to that acquired by Dawn in the underlying lawsuit. See *id.* at 524-25.

¶ 60    Relevantly, in *Grant*, our supreme court determined whether Grant's interest as a third party subsequent purchaser would be superior to the interests rendered in the lawsuit involving the same property filed by Rockafellow. *Id.* at 521. In doing so, our supreme court considered, *inter alia*, two separate and distinct questions before reaching a conclusion. *Id.* Initially, our supreme court addressed whether Grant had constructive notice of Rockafellow's lawsuit against Newcomb from the filing of the bill in the circuit court. See *id.* at 521-23. Next, our supreme court addressed whether Grant, while lacking constructive notice, had actual knowledge of the lawsuit filed by Rockafellow against Newcomb. See *id.* at 521, 523-25.

¶ 61    Ultimately, our supreme court held that Grant lacked both constructive and actual notice of Rockafellow's lawsuit and, therefore, had an interest in the property that was superior to any interest rendered by the outcome of that lawsuit. *Id.* at 521-25. When addressing the initial question focused on Grant's constructive notice, our supreme court stated: "[t]he service of subpoena alone is not sufficient, but a bill must also be filed, and where a bill has been filed and a subpoena served, whether the bill was filed before or after service, *lis pendens* begins from the date of the service and not from the filing of the bill." *Id.* at 521. Grant was protected from the harshness of *lis pendens* due to the timing of Rockafellow's bill and the service of Newcomb. *Id.* at 521-22. Constructive "notice to the world" did not exist until Newcomb was served with the summons. *Id.* at 522.

¶ 62    Before moving on to the second question in *Grant*, we state the obvious by observing that our supreme court was well aware that personal jurisdiction over Newcomb was established three days after the property was conveyed to Grant. *Id.* at 522. Nonetheless, our supreme court

- 11 -

proceeded to consider the consequences for Grant if he possessed actual notice of Rockafellow's lawsuit against Newcomb when purchasing the property. *Id.* at 523-25.

¶ 63    When addressing Grant's actual notice, our supreme court knew, at the time Newcomb conveyed the subject property to Grant, neither Newcomb nor Grant knew anything about the filing of the bill in the circuit court by Rockafellow. *Id.* at 520. In addition, the supreme court observed that Grant lacked any actual knowledge that "Rockafellow had any claim to the property, or that there was danger of litigation over the title" when Grant purchased the property from Newcomb. *Id.* at 523. Further, our supreme court emphasized that Grant testified he had no actual knowledge that "any difficulty existed between Miss Newcomb and Rockafellow," "any person had any claim on the land," or "of whom or how [Miss Newcomb] acquired the title to the property." *Id.* at 524. After clarifying that Grant lacked both constructive and actual notice, our supreme court treated Grant as an innocent third party that was protected from the reach of the doctrine of *lis pendens*. See *id.* at 522, 524-25. In our view, it is clear our supreme court would have reached the opposite outcome if Grant had possessed actual notice of Rockafellow's lawsuit, even where Grant did not have constructive notice.

¶ 64    Our supreme court's discussion of a hypothetical factual scenario where a third party, Grant, had actual notice of a pending lawsuit, is on all fours with the nonhypothetical facts of this appeal. See *id.* at 523-25. In this appeal, unlike in *Grant*, Cindy admitted that she had actual notice of the underlying lawsuit *before* she obtained and then recorded her mortgage. Further, Cindy admitted that she discussed the underlying lawsuit with Sonny, despite the fact that he was not served with a summons after Dawn's 14 good faith, but unsuccessful, attempts. Unlike in *Grant*, Cindy had actual notice of the equities involved in Dawn's lawsuit. See *id.* at 524. Likewise, by virtue of her discussions with Sonny, Cindy had actual notice of the "danger of litigation over the title" of the commercial real estate. See *id.* at 523. Clearly, if Grant had known about the equities involved in Rockafellow's lawsuit against Newcomb, our supreme court would have bound Grant to the outcome of that lawsuit. See *id.* at 524-25.

¶ 65    We cannot ignore the approach employed by our supreme court in *Grant*. See *id.* at 521-25. Therefore, we conclude, for purposes of *lis pendens*, the subsequent timing of personal service is irrelevant when (1) the third party trying to evade the reach of *lis pendens* has actual notice and (2) the circuit court eventually obtains personal jurisdiction over the defendant in the pending lawsuit. If this were not the rule, then the timing of the service on Newcomb in *Grant*, three days after her conveyance of the property to Grant, would have ended our supreme court's inquiry in that case. See *id.* at 521-22. It is significant that once the supreme court found Grant, the third party, lacked constructive notice, it nonetheless felt it necessary to consider his actual notice. See *id.* at 523-25.

¶ 66    While Cindy may have lacked a malicious intent, we conclude she knowingly aided Sonny's encumbrance of the commercial real estate, which was an act in derogation of the representations, warranties, and covenants contained in the purchase agreement subject to the underlying lawsuit. This mutual knowledge of Cindy and Sonny, which was not present between Newcomb and Grant in *Grant*, is detrimental to Cindy's position. See *id.* at 514. Based on these facts, we conclude the date of Sonny's service of process for purposes of the circuit court's jurisdiction over "the person" relates back to the first verifiable date of Cindy's actual notice of the underlying lawsuit, April 8, 2015. See *id.* at 523-25; *Norris*, 152 Ill. at 202; *Pogge*, 293 Ill. App. 3d at 363 (citing 3 Richard A. Michael, Illinois Practice, Civil Procedure Before Trial § 21.1 (1989)). As a result, we hold that Cindy's interests do not take priority over Dawn's

interest arising from the circuit court's June 26, 2017, grant of partial summary judgment and order of specific performance. In other words, Cindy cannot evade *lis pendens* by pointing out that the circuit court obtained personal jurisdiction over Sonny after her actual notice of the underlying lawsuit.

¶ 67    Hence, the circuit court did not err by binding Cindy to her actual notice, consistent with the first category of third party subsequent purchasers or encumbrancers of property. For the reasons set forth above, we affirm the circuit court's dismissals of Cindy's intervention and foreclosure complaints in the underlying and foreclosure lawsuits pursuant to the common law doctrine of *lis pendens*.

¶ 68                            b. Subrogation and Assignment

¶ 69    Next, with respect to subrogation, Cindy claims Dawn and Sonny intended for Cindy's mortgage to be substituted for or replace the mortgage held by Morton Community Bank, as to prevent the commercial real estate from foreclosure before closing. On this basis, Cindy submits her complaints should not have been dismissed. Cindy argues her complaints sufficiently allege that she was subrogated to Morton Community Bank's priority lien position when she, with Dawn's knowledge, lent money to Sonny to pay that institution's mortgage.

¶ 70    Subrogation allows one who has involuntarily paid a debt or claim of another to succeed to the rights of the other with respect to that claim or debt. *Dix Mutual Insurance Co. v. LaFramboise*, 149 Ill. 2d 314, 319 (1992); see also *Paliatka v. Bush*, 2018 IL App (1st) 172435, ¶ 18. Relevantly, there are two types of subrogation: contractual subrogation and common law subrogation. *Paliatka*, 2018 IL App (1st) 172435, ¶ 17. A new lender seeking contractual subrogation to lien priority must demonstrate (1) there is an express agreement that the new lender will be able to assert the rights of the original creditor; (2) the previous debt was, in fact, paid by the new lender; (3) no harm will come to an innocent party if priority is granted to the new lender; and (4) there was no gross negligence. *Id.* In addition, the new lender must record its mortgage, the original mortgage must be in full force and effect at the time of the recording, and the lien priority must be limited to the original amount perfected by the original creditor. *Id.*

¶ 71    In contrast, common law subrogation arises as a result of the payment on behalf of another. *Id.* ¶ 18. In this context, subrogation is an equitable remedy that attains "substantial justice" by "placing ultimate responsibility for the loss upon the one against whom in good conscience it ought to fall." *LaFramboise*, 149 Ill. 2d at 319. The one asserting subrogation must "step into the shoes of, or be substituted for, the one whose claim or debt he has paid" and enforce only "those rights which the latter could enforce." *Id.* Such a right depends upon the equities of each case. *Paliatka*, 2018 IL App (1st) 172435, ¶ 18. Again, a party must show that he or she involuntarily paid the debt of another and seeks to assert the rights of the original creditor against the one whose debt was absolved. *Id.* Common law subrogation can prevent injustice or unjust enrichment but cannot apply to create an inequitable result. *LaFramboise*, 149 Ill. 2d at 319; see also *Paliatka*, 2018 IL App (1st) 172435, ¶ 18.

¶ 72    Here, the facts alleged by Cindy do not support either contractual or common law subrogation. With respect to contractual subrogation, Cindy, at a minimum, fails to identify any express agreement that would allow her to assert the rights of Morton Community Bank. See *Paliatka*, 2018 IL App (1st) 172435, ¶ 17. It is insufficient for Cindy to merely allege that

Dawn and Sonny intended for Cindy's mortgage to replace or be substituted for an existing mortgage.

¶ 73 Common law subrogation is equally problematic for Cindy. "[S]ubstantial justice" would not be attained by "placing ultimate responsibility for the loss" on Dawn. See *LaFramboise*, 149 Ill. 2d at 319. Forcing responsibility on Dawn would inequitably subordinate her right to acquire clear title to the commercial real estate, under the purchase agreement and orders of specific performance, to a mortgage that was executed and recorded, in derogation of the representations, warranties, and covenants contained in that purchase agreement, when Dawn was in good faith attempting to serve Sonny. See *id.*; *Paliatka*, 2018 IL App (1st) 172435, ¶ 18.

¶ 74 Similar to our application of subrogation principles, we are unpersuaded that Cindy has any claim of an assignment. Due to the absence of an express agreement, any claim of an assignment by Cindy must fail. See *Stoller v. Exchange National Bank of Chicago*, 199 Ill. App. 3d 674, 681 (1990) ("Generally, no particular form of assignment is required; any document which sufficiently evidences the intent of the assignor to vest ownership of the subject matter of the assignment in the assignee is sufficient ***."); *Cincinnati Insurance Co. v. American Hardware Manufacturers Ass'n*, 387 Ill. App. 3d 85, 100 (2008) ("A valid assignment 'needs only to assign or transfer the whole or a part of some particular thing, debt, or chose in action and it must describe the subject matter of the assignment with sufficient particularity to render it capable of identification.' "). As was true with respect to subrogation, it is insufficient for Cindy to vaguely allege the intentions of Dawn and Sonny in relation to her recorded mortgage.

¶ 75 c. Cindy's Intervention Complaints in the Underlying Lawsuit

¶ 76 The purpose of intervention is to "expedite litigation by disposing of the entire controversy among the persons involved in one action to prevent a multiplicity of lawsuits." *People ex rel. Alvarez v. Price*, 408 Ill. App. 3d 457, 464 (2011). If intervention is allowed, the intervenor, with some exception, will have "the rights of an original party." 735 ILCS 5/2-408(f) (West 2016). The decision to allow or deny intervention will not be disturbed absent an abuse of discretion. *Winders v. People*, 2015 IL App (3d) 140798, ¶ 13.

¶ 77 We have carefully considered the unique procedural posture of this case. The pleadings are unusual in that neither Cindy's petition to intervene nor her subsequently filed intervention complaints make any reference to the applicable statutory provisions governing intervention. See 735 ILCS 5/2-408 (West 2016). Had the circuit court been directed to the Code, it likely would have become very apparent that Cindy's petition to intervene, filed after final judgment was rendered between Sonny and Cindy by the circuit court in the underlying lawsuit, was untimely. See *id.*

¶ 78 Nonetheless, the applicable statutory provision governing the process of intervention, section 2-408, requires that the party "desiring to intervene shall present a petition setting forth the grounds for intervention, accompanied by the initial pleading or motion which he or she proposes to file." See *id.* § 2-408(e). The petition to intervene filed by Cindy was not accompanied by an initial pleading. See *id.* Instead, Cindy's petition to intervene included a request for "45 days to file any necessary pleadings." This request was granted, by agreement of the parties, on December 5, 2017.

¶ 79 It appears to our court that Cindy's petition to intervene operated as a request for leave to file the "initial pleading" required by section 2-408(e). See *id.* Thereafter, Cindy timely filed

intervention complaints in the underlying lawsuit on January 18 and September 21, 2018. In each intervention complaint, Cindy requested "the court to allow [her] to participate in the case." It seems that if we were to construe the order entered by agreement on December 5, 2017, as an order granting intervention, then Cindy's prayer for relief in the subsequent intervention complaints would have sought relief other than to allow Cindy to "participate" in the underlying lawsuit.

¶ 80    Even assuming for the sake of argument that the circuit court's order, dated December 5, 2017, granted Cindy intervenor status without an "initial pleading," we conclude the circuit court did not erroneously grant Dawn's section 2-619(a)(9) motions to dismiss on June 8, 2018, or January 30, 2019. Therefore, we conclude that for purposes of this appeal Cindy no longer has the status of an intervenor. Consequently, we will not be addressing the remaining issues raised by Cindy in appeal No. 3-19-0218.[8]

¶ 81                    2. Sonny's Challenge to Dawn's Awards of
                    Attorney Fees and Rent Under the Purchase Agreement
                                in the Underlying Lawsuit

¶ 82    We now turn to the separate and independent issues raised by Sonny. By way of review, the circuit court ordered Sonny to pay $50,000 in attorney fees at the closing. The $50,000 amount was significantly less than the amount requested by Dawn. Dawn has not challenged this award. Further, Sonny was ordered to pay Dawn $1936 in monthly rent "through the date of closing," resulting in a credit of $102,608 against the purchase price of the commercial real estate.

¶ 83    According to Sonny's contentions on appeal, section 4(B)(i) and (ii) of article II do not justify an award of attorney fees. Likewise, the language in section 5 does not justify the circuit court's order concerning Dawn's attorney fees. Relatedly, Sonny notes that the language relied upon by the circuit court to justify the award of attorney fees is not present in the purchase agreement. As pointed out by Sonny, the circuit court was misguided by the language contained in Dawn's petition for attorney fees. We agree attorney fees are not recoverable by Dawn under the purchase agreement.

---

[8]We also note that, had the parties cited to the Code, it would have become apparent to the circuit court that Cindy's petition to intervene was also untimely. Under section 2-408(a) of the Code, a party, upon timely application, is permitted as of right to intervene. See 735 ILCS 5/2-408(a) (West 2016). However, " 'a person may not normally seek intervention after the rights of the original parties have been determined and a final decree entered [citation].' " *Winders*, 2015 IL App (3d) 140798, ¶ 14. Indeed, a party seeking intervention after the judgment must explain its failure to seek intervention before the judgment. *Id.* If a party does not do so, then "that party has failed to demonstrate due diligence and the petition to intervene may be denied as untimely." *Schwechter v. Schwechter*, 138 Ill. App. 3d 602, 604 (1985). Here, Cindy knew of the underlying lawsuit as early as April 8, 2015, yet she, without explanation, waited until December 5, 2017, to file her petition to intervene. This was two years and nine months after Dawn filed the underlying lawsuit and five months and nine days after the circuit court entered partial summary judgment in favor of Dawn. Under these circumstances, the circuit court could have properly denied Cindy intervention on the alternative basis of untimeliness. See *id.*; *Winders*, 2015 IL App (3d) 140798, ¶ 14; see also *RTS Plumbing Co. v. DeFazio*, 180 Ill. App. 3d 1037, 1042 (1989).

¶ 84    However, we may affirm the circuit court on any basis supported by the record. *Bocock v. McGuire*, 2017 IL App (3d) 150860, ¶ 11. That basis, supported by this record, is Sonny's wrongful act of encumbering the commercial real estate with a mortgage to Cindy, in derogation of the representations, warranties, and covenants contained in the purchase agreement, requiring Dawn to incur expenses in litigation to protect her interest in that property. See *Ritter v. Ritter*, 381 Ill. 549, 554 (1943) (citing *Philpot v. Taylor*, 75 Ill. 309, 310-11 (1874), *McEwen v. Kerfoot*, 37 Ill. 530, 537-38 (1865), and *Himes v. Keighblingher*, 14 Ill. 469, 471-72 (1853)); *Nalivaika v. Murphy*, 120 Ill. App. 3d 773, 776 (1983); *Sorenson v. Fio Rito*, 90 Ill. App. 3d 368, 372-73 (1980). Our supreme court has recognized:

> "[W]here the wrongful acts of a defendant involve the plaintiff in litigation with third parties or place him in such relation with others as to make it necessary to incur expense to protect his interest, the plaintiff can then recover damages against such wrongdoer, measured by the reasonable expenses of such litigation, including attorney fees." *Ritter*, 381 Ill. at 554 (citing *Philpot*, 75 Ill. at 310-11, *McEwen*, 37 Ill. at 537-38, and *Himes*, 14 Ill. at 471-72).

¶ 85    Importantly, "[c]are must be taken to distinguish between the ['American rule'] prohibiting the recovery of attorney fees from the losing party by the prevailing party in litigation and the rule allowing the recovery of attorney fees incurred in litigation with third parties necessitated by defendants' wrongful act." *Nalivaika*, 120 Ill. App. 3d at 776; see also *Sorenson*, 90 Ill. App. 3d at 372-73 (discussing *Ritter* and the distinction between attorney fees recoverable as ordinary damages and attorney fees not recoverable as costs of litigation). This is because attorney fees incurred by the plaintiff in actions with third parties, brought about by the defendant's misconduct, are "merely a form of damages and are accordingly recoverable from the defendant." *Nalivaika*, 120 Ill. App. 3d at 776. As has been stated in the case law, the "American rule" "was [not] intended to preclude a plaintiff from recovering losses directly caused by the defendant's conduct simply because those losses happen to take the form of attorneys' fees." See also *Sorenson*, 90 Ill. App. 3d at 372.

¶ 86    While not unlawful, Sonny's conduct in this case was wrongful under the purchase agreement. Thus, the circuit court's decision to award Dawn reasonable attorney fees can be affirmed as proper damages for Sonny's wrongful act of encumbering the commercial real estate, in derogation of the representations, warranties, and covenants contained in the purchase agreement, thereby requiring Dawn to incur expenses in litigation with Cindy to protect her contractual interest in that property. See *Bocock*, 2017 IL App (3d) 150860, ¶ 11; *Ritter*, 381 Ill. at 554 (citing *Philpot*, 75 Ill. at 310-11, *McEwen*, 37 Ill. at 537-38, and *Himes*, 14 Ill. at 471-72); *Nalivaika*, 120 Ill. App. 3d at 776; *Sorenson*, 90 Ill. App. 3d at 372. Thus, in accordance with the above authorities, we affirm the circuit court's decision to allow Dawn to recover reasonable attorney fees from Sonny for the necessity of defending her interest in the commercial real estate once Cindy intervened in the underlying lawsuit and separately filed the foreclosure lawsuit.

¶ 87    Notwithstanding this holding, there remains the issue of whether the $50,000 attorney fees award was arbitrary, unreasonable, or excessive, warranting a remand for an evidentiary hearing. A circuit court has broad discretionary powers to award attorney fees, so a reversal is proper only if there was an abuse of discretion. *In re Estate of Callahan*, 144 Ill. 2d 32, 43-44 (1991); accord *Mirar Development, Inc. v. Kroner*, 308 Ill. App. 3d 483, 485 (1999).

¶ 88        Further, the party seeking attorney fees bears the burden of presenting sufficient evidence for the circuit court to render a decision on the reasonableness of the request. *In re Estate of Callahan*, 144 Ill. 2d at 43; *Gambino v. Boulevard Mortgage Corp.*, 398 Ill. App. 3d 21, 66 (2009). "An appropriate [attorney] fee consists of reasonable charges for reasonable services." *Gambino*, 398 Ill. App. 3d at 66. For an attorney fee to be justified, a party must present more than "a mere compilation of hours multiplied by a fixed hourly rate or bills issued to the client." *Id.* This type of data, without more, "does not provide *** sufficient information as to [the attorney fees'] reasonableness—a matter which cannot be determined on the basis of conjecture or on the opinion or conclusions of the attorney seeking the fees." *Id.*

¶ 89        Instead, a party seeking attorney fees must "specify the services performed, by whom they were performed, the time expended thereon and the hourly rate charged therefor." *Id.* The importance of these factors necessitates "detailed records maintained during the course of the litigation containing facts and computations upon which the charges are predicated." *Id.* Once the circuit court receives this information, it should also consider the following factors:

> "[T]he skill and standing of the attorneys, the nature of the case, the novelty and/or difficulty of the issues and work involved, the importance of the matter, the degree of responsibility required, the usual and customary charges for comparable services, the benefit to the client [citation], and whether there is a reasonable connection between the fees and the amount involved in the litigation." *Id.* at 66-67.

See also *In re Estate of Callahan*, 144 Ill. 2d at 44; *Ashby v. Price*, 112 Ill. App. 3d 114, 122 (1983).

¶ 90        In this case, we have affirmed Dawn's entitlement to attorney fees on an alternative basis than that of the circuit court. Hence, we conclude the prudent course is to remand the matter with directions for the circuit court to hold an evidentiary hearing to determine the reasonableness of any award of attorney fees, capped at $50,000. See *Gambino*, 398 Ill. App. 3d at 66-67; *In re Estate of Callahan*, 144 Ill. 2d at 43-44; *Ashby*, 112 Ill. App. 3d at 122. At the hearing, Dawn's counsel bears the burden of proof. See *Gambino*, 398 Ill. App. 3d at 66-67; *In re Estate of Callahan*, 144 Ill. 2d at 43. The circuit court need not revisit the issue of attorney fees as an offset to the commercial real estate's purchase price. We hold that the circuit court did not err by ordering attorney fees to be paid at closing. See *Lobo IV, LLC v. V Land Chicago Canal, LLC*, 2019 IL App (1st) 170955, ¶¶ 125, 134.

¶ 91        Next, with respect to rent, Sonny argues the circuit court misapplied section 3(K)(ii) of article II of the purchase agreement. Sonny contends that section does not provide for a rent credit against the purchase price as a result of his refusal to turn over the commercial real estate. We turn to the language of the purchase agreement to resolve this issue. Section 3(K)(ii) provides:

> "Rents under all leases of the Real Property (exclusive of delinquent rents, but including prepaid rents) *** and other payments payable by tenants, for or in connection with such use of occupancy thereof; operating expenses; personal property taxes, if any; and all other items customarily prorated or adjusted on the conveyance of similar properties shall be prorated as of the Closing Date."

Regarding Dawn's duty to pay rent before the closing date of February 14, 2015, the circuit court stated: "[t]here is no dispute [Dawn] paid [Sonny] monthly rent of $1936.00." The circuit court then, when applying section 3(K)(ii), found "From 2/14/15 *** through the date of closing shall be prorated and credited to [Dawn.]" We agree with Sonny and conclude that

section 3(K)(ii) is applicable to the proration of rent and other expenses that Dawn would owe to Sonny, under their existing leases, until the closing date when Dawn, as a former tenant, would take possession. This provision does not support an award of monthly rent to Dawn.

¶ 92     However, as was noted above, we may affirm the circuit court on any basis supported by the record. *Bocock*, 2017 IL App (3d) 150860, ¶ 11. The case law provides that "when a decree of specific performance does not provide complete relief, the injured party is entitled to those damages that will make him whole." *Mandel v. Hernandez*, 404 Ill. App. 3d 701, 706 (2010); see also *Douglas Theater Corp. v. Chicago Title & Trust Co.*, 266 Ill. App. 3d 1037, 1043 (1994); Restatement of Contracts § 384(2) cmt. d (1932) ("Whether so asked by the plaintiff or not, it is within the discretion of the court to give such remedies as full and complete justice may require [citation]."); Restatement (Second) of Contracts § 358(3) (1981). Even lost profits are recoverable as damages for a breach of contract if (1) the lost profits are proved within a reasonable degree of certainty, (2) the circuit court is satisfied the wrongful act of the defendant caused the loss of profits, and (3) the profits were reasonably contemplated at the time of contract. *Mandel*, 404 Ill. App. 3d at 706.

¶ 93     Thus, we vacate the circuit court's award of rent under the purchase agreement. However, we remand the matter for the circuit court to receive arguments on the proper amount, if any, Dawn should recover as damages for the time she was barred from her possession of the commercial real estate. This is, of course, unless the parties can reach an agreement on these matters.

¶ 94                                  B. Appeal No. 3-19-0536

¶ 95     The issues presented in appeal No. 3-19-0536 pertain to Judge Gilles's enforcement of Judge Gorman Hubler's January 30, 2019, order, in the underlying lawsuit. The issues may be stated as whether, when overseeing the transfer of the deed to and monies for the commercial real estate, Judge Gilles lacked jurisdiction to (1) order Sonny to pay attorney fees as an offset to the purchase price or (2) add language to the deed transferring the commercial real estate.

¶ 96     By virtue of our holding in section A(1)(c) above, Cindy does not have intervenor status for purposes of this appeal and is without standing to properly challenge these issues. Neither Sonny nor Dawn have filed a notice of appeal challenging Judge Gilles's rulings. Thus, we will not reach the merits contained in Cindy's briefs in appeal No. 3-19-0536.

¶ 97                                  III. CONCLUSION

¶ 98     The judgment of the circuit court of Peoria County is affirmed in part and reversed in part.

¶ 99     Affirmed in part and reversed in part.

¶ 100    Cause remanded with directions.